MEMORANDUM OF DECISION
On July 10, 1998, the Department of Children and Families, CT Page 451 hereafter "DCF", filed co-terminous petitions for neglect and termination of parental rights concerning Aaron H., now ten months old. Aaron is the youngest of four children born to his mother, Patricia H. His biological father is unknown. Patricia has had long standing problems with alcohol and cocaine addiction and her rights to two older siblings of Aaron, James B. and Christopher H. were terminated on May 11, 1994 and December 4, 1997 respectively. Guardianship of her oldest child, Tiarra, was transferred to the maternal grandparents, with whom this child still resides.
In July, 1998, Patricia left Aaron in the care of a casual acquaintance so that she could go out drinking. While she stated she would return in a few hours, she did not do so until early the following morning, arriving after the child's caretaker had taken the child to the police station. At that time, DCF secured an order of temporary custody, (Ward, J.) and placed the child in foster care. At trial, DCF proceeded on the neglect grounds that the child had been abandoned, is being denied the proper care and attention, physically, educationally, emotionally or morally and being permitted to live under conditions, circumstances or associations injurious to his well-being. The termination petition alleges abandonment, acts of omission and commission and that there is no ongoing parent-child relationship with the father. It also alleges pursuant to Connecticut General Statutes § 17a-112(c)(3)(E) that the child, who is neglected or uncared for, is under the age of seven, his mother has had her rights terminated as to other children and that she has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. At trial, DCF proceeded on the last ground. On September 23, 1998, Patricia filed a motion to revoke the order of temporary custody concerning Aaron, which was consolidated with the petition for trial. At the conclusion of the trial, closing arguments were submitted in writing with the last submission on January 5, 1999.
 1. PRELIMINARY MATTERS Failure to Provide Legally Adequate Notice to the UnknownBiological Father:
Aaron's biological father is unknown. Patricia disclosed to DCF that at the time of the child's conception, she was engaged CT Page 452 in prostitution. Because of her multiple sexual partners, she does not know the identity of Aaron's biological father. DCF also spoke with Patricia's parents and hospital officials concerning available information about the father of this child. There was none. An affidavit of reasonable efforts to locate the biological father was filed with the court. No one claiming to be the father of Aaron has come forward during the pendency of this matter. Further, there was no publication of notice of the proceedings to the unknown father, using the customary appellation of "John Doe." Under the circumstances, the court concludes that DCF made reasonable efforts to locate the father, but that legally notice to the unknown biological father was defective.
The United States Supreme court has held that parents possess a fundamental liberty interest in their children and that "(w)hen the State moves to destroy the weakened familial bond, it must provide the parents with fundamentally fair procedures." Santoskyv. Kramer, 455 U.S. 745, 754 (1982). Many years prior to its holding in the termination of parental rights context, the United States Supreme Court in Mullane v. Central Hanover Bank TrustCo., 339 U.S. 306, 314 (1949) held that the constitutional requirement that no person be deprived of due process of law was violated where a person was given only newspaper publication notice of proceedings against him, unless that person could not be located after the exercise of reasonable diligence. In addition, the Connecticut Supreme court in Cato v. Cato,226 Conn. 1, 9, 626 A.2d 734 (1993) found Mullane had continued vitality and quoted from the decision:
 "`If notice by publication is to be utilized, the plaintiff must clearly and in detail set forth in affidavit form all the steps taken to determine whether notice in some other form could be given so that the court may make an independent determination of the adequacy of the notice.'"
In this case, notice by publication, based on the affidavit, would have been proper, but this important step was not performed. Based on due process protections to which Aaron's biological father, even if unknown, is entitled, the court continues the case as to him to permit such publication and will schedule a brief hearing on March 11, 1999 at 9:30 a.m. to make further findings as required.
 2. FACTS
CT Page 453
The court has heard testimony from the DCF social workers, therapists from drug treatment facilities where Patricia received treatment, her probation officer, a counselor at the Alternative Incarceration Center to whom Patricia reported, the maternal grandmother as well as from Patricia herself as to her progress in her long struggle to overcome her addiction. The court also heard from the individual with whom Patricia left Aaron in July, 1998 and the police officer who responded to the matter at that time. Bruce Freedman, the court-appointed psychologist evaluator, testified as to his earlier evaluations of Patricia and the likelihood of her present ability to care for Aaron, based on his review of the social study prepared in this matter in July, 1998. The evidence offered at trial, as interpreted in the light of the prior record in this court concerning Aaron, and judicial notice taken of all court action which affected him and his two older siblings support the following findings of fact.
Patricia has had a severe drug and alcohol problem since her adolescence. She also has a criminal history commencing in 1991 which reflects her drug use, with convictions for possession of drug paraphernalia, breach of peace, several failure to appear charges as well as possession of narcotics on two occasions. Patricia was incarcerated at York Correctional Facility in 1997 and in 1998.
In late 1997, Patricia's rights to her third child, Christopher, were terminated. At that time, she was incarcerated. By December 12, 1998, she was placed at NEON Quinlan Cottage, a residential drug treatment facility where she remained until June 16, 1998, when the time she was required to serve with the Department of Corrections ended. Her child, Aaron, was born on March 3, 1998, while Patricia was in the treatment facility and he was permitted to remain in his mother's care there. As previously found, Aaron's biological father is unknown. During the time Patricia was at the treatment facility, her efforts toward rehabilitation were minimal. She had a great deal of difficulty conforming to house rules, getting up on time, following the directions of staff. The director of the halfway house testified that while there, Patricia did "just barely what she needed to be there." She also stated that Patricia was having difficulty in dealing with Aaron in this structured setting. Other patients spoke of her yelling and swearing at the child and her frustration at caring for him at night.
While she could not speak directly to her work in treatment, CT Page 454 the program director testified stated that Patricia did not work in the program and that she was not committed to change. The director indicated that at the time of discharge, Patricia's plans for her immediate future were unrealistic. She planned to stay in the house to avoid further drug use and had no adequate plan for housing. At the time of discharge, the director stated she spoke with Patricia about her need for ongoing drug treatment, for a parenting program in the community and counseled her to use DFC to access such services. In her opinion, Patricia needed continued inpatient treatment at the time of her release on June 18, 1998. She stated that she called the DCF Careline when Patricia was discharged from the drug treatment center because she believed the child was in an "at-risk situation." Although the director did not know the details of the events leading to DCF's removal of Aaron from his mother's care, she stated that "it was staring in our face that it was not going to work."
For several weeks after leaving the treatment program, Patricia lived with her parents. Her parents had made plans to have their house painted and Patricia moved out temporarily. On the evening of July 7, 1998, Patricia came to the apartment of a man she knew as "Al". At about nine o'clock at night, she knocked on the window of his second floor apartment and he let her in. Al J., who is seventy-two years old, testified that he had last seen Patricia about two years ago with some other females, but did not know her name. He stated that Patricia had the baby with her that night and asked him for twenty dollars to pay a debt. They then took a ride in his car to locate the individual to whom Patricia owed the debt, but could not locate him. They went to a second location where they were both charged with simple trespass by the police and then released. When they returned to the Al's apartment, Al refused to drive her anywhere else. Patricia then asked Al to watch Aaron for an hour while she went out. By now, it was about eleven at night. Al agreed, even though Patricia left no diapers, and only one bottle of formula about half full. Patricia did not return all night and about six in the morning, Al went with the child to the police department who referred him to the hospital. DCF invoked its 96 hour hold and took custody of Aaron at that time. When Al was cross-examined about his activities with the females earlier when he first met Patricia, he did not answer directly. Given the nature of his answers and his evasions, the court concludes that Al and the others were involved in drug related activities and that Patricia knew him from the days prior to her incarceration on drug charges. When CT Page 455 Patricia returned to Al's apartment at 7:30 the following morning, she was arrested and charged with risk of injury to a minor.[2]
Patricia also testified to the events of the evening of July 7, 1998. She admitted she was an addict and that at the time of the incident she was attending an outpatient drug treatment program. She testified that in July, 1998, she was staying with a former boyfriend, Scott B., and then decided to go for a walk. During her walk in the downtown area of the town in which she resided, she ran into another acquaintance who reminded her she owed her some money. She stated that she came to Al's apartment about 8:30 that night and they talked about old times and the people they knew. She testified that they then had one or two small mixed drinks in his kitchen. This made her decide to go out and have a few beers. One thing led to another after she went to a bar and ran into several old acquaintances. She finished the evening at a house where she could not get a ride back to Al's apartment as the others were worried about driving under the influence. Patricia admitted that her actions that evening were not proper. She also admitted that she had used cocaine two days earlier and stopped as she knew that was wrong. She believes, nonetheless, that she had made great progress and has not used drugs or alcohol since that time. She testified that she had been in an outpatient drug and alcohol treatment program. When asked why things were different for her this time than after the many previous treatment programs she has attended, she testified that she believed that she had hit rock botton now. She is getting help and attending various twelve step programs. She believes that she has been doing a great job and that she should soon be fully about to care for her child. She also believes that her child loves her and needs her.
A counselor from the outpatient treatment program Patricia is attending also testified. He stated that Patricia began this program on September 25, 1998. Patricia was in group sessions three times a week and since November 2, 1998 she has been in individual counseling with him. In his opinion, Patricia had engaged in the treatment. He stated that he had concerns about her relapse history. He did know that Patricia was in the program as a result of the pending criminal charges under an alternative incarceration program, and that if she were discharged from the program for non-compliance, she would again be incarcerated. Bruce W. Freedman, the court appointed psychologist who evaluated Patricia in 1992 with her second child, James B., and in 1997 CT Page 456 with her third child, Christopher H.,[3] testified that in his opinion Patricia had a very serious and chronic drug and alcohol abuse problem. He stated that she did not show "any understanding about how serious her problem was and what it would take to treat it." In the five year interval between his two evaluations, he saw no change in her attitudes. He stated that in his opinion Patricia needed one to two years of long term residential treatment and that anything short of that would not begin to address her problems. He reviewed the social study prepared in connection with the co-terminous petitions for Aaron and testified that the events which had taken place since his last evaluation "were completely consistent with her past behavior and her lack of recognition of the problem. With this type of person," he testified, "it is like falling off a cliff and she loses all judgment. This is what makes her so dangerous to children." He also stated that in addition to her substance abuse problems, Patricia had a problem with her relationships. He stated that this was demonstrated in the "casual but dangerous ways she was involved with a lot of people." He did not recommend return of Aaron to her care at the present time. Given the length of time she needed treatment, he stated that it would not be recommended for Aaron to wait this long in the hopes of a permanent living situation which might never be there for him with his mother.
While there were no expectations ordered by the court in the co-terminous petitions, there were specific steps ordered in the previous termination petition pending regarding Christopher H. Specifically, on January 10, 1997, the court ordered Patricia to take certain steps which included maintaining adequate housing and income, avoiding further involvement with the criminal justice system and securing a substance abuse evaluation and following the recommendations of the evaluation. The court concludes from the evidence that the issues in Patricia's life since the order terminating her rights to Christopher on December 1997 have not changed. Patricia has made no demonstrable progress in attaining these goals.
From the testimony, the court concludes that the treatment Patricia received in the NEON program did not provide her with an adequate understanding of the seriousness of her addiction. She had no realistic plan for dealing with any future relapses and no stable and sober support system of people on whom she could rely for help for herself and the baby when the inevitable relapse came. That relapse occurred in July, 1997, when Patricia again CT Page 457 began to go down the path of abusing cocaine and alcohol. The court further concludes from the testimony that while Patricia is now doing what is minimally required of her, attending the outpatient treatment program at the McCall Foundation, she does not yet demonstrate an appreciation of the seriousness of her long standing addiction problems and its impact on her children.
As has been noted, "it is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." Dadio v. Dadio, 123 Conn. 88, 92,192 A.2d 557 (1937). And the court concludes, based on the testimony, that Patricia has not begun to make the required personal changes which would permit her to safely parent her child. She did not speak about Aaron's needs as she understood them and her plans to meet those needs, she did not discuss any plans for relapse prevention at the present or those no-addicted individuals she has in her life who could help in the event of a relapse. She demonstrated no meaningful insight into her difficulties and the tremendous effort it will take for her to overcome her addictions. For this mother, with her past history of addiction and history of neglect of her children with DCF to leave her newborn child, not yet three months old, with an elderly male acquaintance from the days when she was actively drug involved, demonstrated as of July 1998 her failure to understand the seriousness of her condition and the needs of her child. Her drinking beer in a bar and going with others to another location where she had no reliable means of transportation further demonstrate that she was not then in a position to place the needs of her child ahead of her own needs. As Dr. Freedman stated, "it is like falling off a cliff." Patricia's rapid and immediate descent into the disordered world of the addict which led her to leave her child with Al F. without diapers, with no knowledge of his caretaking skills and no means of contacting him, all point to the dangerousness of her condition to a child. Fortunately, nothing untoward happened to Aaron that evening, but that fortunate fact does not lessen the seriousness of Patricia's conduct at that time.
Aaron, in the meantime, has been in foster care from the time he was three months old until the present, three-quarters of his short life. Patricia was given a unique opportunity, in view of her past history, including her criminal history, to keep the child with her while in an in-patient treatment program and to learn the skills necessary to retain and parent this child, while CT Page 458 coping with her addiction problems. Unfortunately for Aaron, she was not able to continue, once released from residential treatment, to maintain her sobriety and to adequately care for him.
When Aaron was placed in foster care, he was not then up to date on his immunizations. Also, this child was and remains a very heavy baby for his age, which has caused some difficulties in his development. For the first few weeks after he was removed from his mother, he was placed in one foster home and then placed on August 4, 1998 in the home where his older half-brother Christopher resides. The foster mother testified that the baby is now thriving. Aaron is involved in the "Birth to Three" program. He is a happy and well adjusted child. As of November 10, 1998, he was crawling. She stated that there is a bond between the two children. "Aaron mimics everything his older brother does. The two boys play together, get dressed together and eat together." She and her husband plan on adopting Christopher and would like to adopt Aaron as well. She testified that "Christopher's situation in life has been a challenge." She believes it to be beneficial to him to have a sibling growing up with him so that "he will always have someone in his life."
Since his placement in foster care with DCF, Patricia has not visited with Aaron as often as possible. DCF offered her weekly visitation and bus passes to have supervised visitation at the DCF offices. Patricia refused the passes, but has had some sporadic supervised contact with Aaron. She has also refused the further residential substance abuse treatment at the NEON program offered to her, which included counseling, treatment, twelve step program meeting three times a week, as well as parenting skill training.
 3. NEGLECT ADJUDICATION
When co-terminous petitions for neglect and termination of parental rights have been filed, DCF must first prove and the court must first find neglect before addressing the issue of termination. Connecticut General Statutes § 17-717(g)(E). On July 10, 1998, by a preponderance of the evidence, indeed by clear and convincing evidence, the court finds that Aaron was a neglected child in that he was abandoned by his mother. Patricia, in leaving Aaron with a casual acquaintance without adequate provision for him, also permitted him to live under conditions, circumstances or associations injurious to his well-being and he CT Page 459 was also being denied proper care and attention. Her drug addiction and active use of drugs, as well as her inability to remain in and complete a treatment program mandates such findings. She could not then care for Aaron and it quite possible, without the intervention of DCF, her alcohol use would have created more serious problems for the child than it did, due to the prompt intervention which took place. The court finds that Aaron was a neglected child pursuant to Connecticut General Statutes § 46b-120. Based on the facts and the court's ruling, the court denies the Respondent mother's motion to revoke temporary custody.
 4. TERMINATION ADJUDICATION A. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Connecticut General Statutes § 17a-112(c)(1). DCF in its verified petition does not claim that it made reasonable efforts for reunification and alleges that the mother was unable or unwilling to benefit from such efforts. In this case, the court concludes that Patricia H., from the clear and convincing evidence, is both unwilling and unable to benefit from reunification efforts. The court bases this on her unwillingness to attend and participate in a residential and intensive substance abuse programs to deal with her significant and long standing addictions. Further, the court notes Patricia's inability to achieve any meaningful change in at least seven years while receiving the help of many drug abuse counselors and programs which she has attended in the past. Her inability to benefit from these programs and services was amply demonstrated in the DCF record and by the evidence.
 B. Failure to Rehabilitate
The court finds, by clear and convincing evidence, that DCF has proven that Patricia has failed to rehabilitate so that she could adequately parent Aaron either now or at some reasonably foreseeable time in the future. The court has adjudicated Aaron H. a neglected child and he is under the age of seven. As previously found from the record, her rights to two older CT Page 460 siblings of Aaron's were terminated. Given her many years of substance abuse, DCF has proven by clear and convincing evidence that Patricia had failed on July 10, 1998 and to the present time to rehabilitate herself so it would be possible to conclude, within a reasonable period of time, given Aaron's age and needs, she could care for him.
 5. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e):
1) The court has previously concluded that Patricia was unwilling and unable to benefit from services for reunification with Aaron.
2) Because of the court findings pursuant to Section 1 hereof, the statutory requirement have been met and there is no need to make a finding of reasonable efforts.
3) DCF entered into reasonable and realistic court expectations in order to reunify the family in the prior proceedings for the two older siblings of Aaron. It was reasonable, given her long history of substance abuse, for DCF to conclude that Patricia was not able to benefit from services and to set no expectations for reunification with her youngest child, Aaron.
4) Aaron has emotional ties with his foster family and his brother, Christopher. He does not know his mother.
5) Aaron is ten months old.
6) Patricia has not maintained reliable contact with this young child and has done only the required minimum to adjust her circumstances. Her sobriety is of very short duration and her testimony makes it plain that she does not comprehend the many steps still required before she can safely parent any child. The court concludes that it is not in the best interests of the child to be returned to her. The efforts she has made are too little and too late for this child, whose needs for permanency are present and immediate.
7) DCF has previously taken many steps to encourage Patricia to have a meaningful relationship with her other children, CT Page 461 Aaron's older siblings. They determined not to intervene and permit her to retain this child, Aaron, while she was in a residential drug treatment program. Patricia was not prevented by financial circumstances from maintaining a relationship with Aaron. Since removing the child from Patricia, based on DCF's conclusion that she could and would not benefit from further efforts towards reunification, no steps were taken except to offer visitation and further drug treatment, which were in part refused.
 6. DISPOSITION
Aaron has spent a substantial portion of his short childhood in foster care. He is in need of permanency. It appears likely that his foster mother will adopt him. His biological mother has made a start on her recovery from drug addiction, but that recovery is only six months old. Giving her more time to rehabilitate and leaving this child's placement still undecided is not in the child's best interests, given the long standing nature of her addiction. Aaron has done well in foster care. The court concludes, based on the clear and convincing evidence, that termination is in his best interests. Accordingly, a termination of the parental rights of Patricia H. is ordered. As the rights of Aaron's unknown biological father have not yet been terminated, the court will commit Aaron to the care and custody of the Commissioner of the Department of Children and Families for a period of one year, until March 20, 2000. The court anticipates, given these circumstances, that upon the termination of Aaron's father's rights to him, the Commissioner of the Department of Children and Families will be appointed the statutory parent for Aaron for the purpose of securing an adoptive family and a permanent placement for him.
Barbara M. Quinn, Judge Child Protection Session
[2] Connecticut General Statutes § 53-21.
[3] Petitioner's Exhibits 8 and 9, dated May 29, 1992 and September 17, 1997.